04-CV-05654-RPT

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| RICK A. YOUNG,<br><br>                Plaintiff,<br><br>     v.<br><br>ELDON VAIL, *et al.*,<br><br>                Defendants. | Case No.  C04-5654RJB<br><br>REPORT AND<br>RECOMMENDATION<br><br>Noted for February 17, 2006 |

     This matter has been referred to the undersigned Magistrate Judge pursuant to Title 28 U.S.C. §§ 636(b)(1)(A) and 636(b)(1)(B) and Local Magistrates' Rules MJR 1, MJR 3, and MJR 4.  This matter comes before the court on defendants' motion for summary judgment. (Dkt. #34).  Having reviewed defendants' motion, plaintiff's response thereto and the remaining record, the undersigned submits the following report and recommendation for the Honorable Robert J. Bryan's review.

<u>FACTUAL AND PROCEDURAL BACKGROUND</u>

     This case involves a civil rights action under 42 U.S.C. § 1983 filed by plaintiff against various Washington State Department of Corrections ("DOC") officials.  Plaintiff alleges in his complaint that these defendants imposed an "ad hoc" mail restriction policy against him in violation of his First, Fifth and Fourteenth Amendment right of freedom of speech, right to petition the government, right of due process, and right of equal protection under the law. <u>See</u> Complaint.  He seeks declaratory and injunctive relief to prohibit defendants from imposing this "ad hoc" policy against him, as well as both compensatory and punitive damages. <u>See id.</u>

REPORT AND RECOMMENDATION
Page - 1

On September 23, 2003, Eldon Vail, Deputy Secretary for the DOC, wrote plaintiff a letter, which reads in relevant part as follows:

> For many years now, staff have been receiving an abundance of correspondence from you on a variety of topics. This correspondence usually involves sending the same letter to several different individuals, threats of litigation, redundancy in the issues raised and condescending remarks. Your approach has resulted in duplication of staff effort, a wasting of state resources and taxpayer money. In almost all cases you have chosen not to utilize the appropriate channels provided to you at the facility level nor cooperate with staff that are working hard to assist you.
>
> Department staff are choosing to centralize the handling of your correspondence in hopes that we will have a better understanding of your true concerns and consistency in response while protecting staff time and effort. We will work to bring satisfactory resolution to any valid issues and/or concerns you may have.
>
> The following guidelines will be used by Department staff in response to any of your future correspondence:
>
> - All correspondence regarding facility related issues should be addressed at your present facility. I encourage you to use the systems in place at your facility to resolve any issues you may have appropriately. Each facility has the authority to carry out Department policy and procedure. Any other correspondence should be sent directly to Denise Vaughan at P.O. Box 41118, Olympia, WA 98504.
> - Duplicate copies of letters to various parties will be responded to from one source.
> - Correspondence will be responded to on a monthly basis, if necessary.
> - Issues that have already been thoroughly addressed will not continue to be dialogued.
> - All comments discriminatory, insulting and/or condescending in nature will not be responded to and may result in appropriate disciplinary action.
>
> It is my hope that you will choose to cooperate with facility staff to appropriately address any valid issues or concerns you currently have at your present facility.

Exhibit 2, Attachment A, Defendant's Motion for Summary Judgment ("Defendant's Motion").

This letter was the product of conversations various DOC officials had regarding the "barrage of correspondence" they apparently were receiving from plaintiff. Exhibit 1 (¶ 4), Defendant's Motion. It was patterned after a previous letter that had been sent to plaintiff by another DOC official in early August 1999, which itself reads in relevant part:

> For over 20 years, Washington State representatives have been in receipt of numerous pieces of correspondence you have originated. Your letters have been tediously reviewed, responded to appropriately, and necessary steps have been taken for effective resolution. It is your predilection for writing state authorities that has prompted investigation into your communication with us to identify, evaluate, and facilitate correction of the root causes of legitimate concerns you may raise regarding the conditions of your confinement. Identification of problems in correctional operations and a focus on civil rights are important to the Department. The type of

REPORT AND RECOMMENDATION
Page - 2

correspondence, the numbers, frequency, and the disposition have been the focus of the assessment. The root causes of the issues you raise have been analyzed and the most appropriate feedback mechanism for resolution addressed.

Response to your correspondence will be addressed with what is considered to be a more direct and comprehensive approach. Our intent is to discourage unnecessary discourse on topics that have been responded to repeatedly over the course of the 20+ years of your incarceration. Your sentiments are appreciated as well as your declarations of having 'given us knowledge,' but the real target is to encourage satisfactory resolution and improved responsiveness to those issues that are of grave concern.

The Department's primary focus is one of evaluation, education, and communication. The Department to encourage this behavior by endorsement of a pro-resolution approach. To initiate pro-active responses to your recital of 'findings' on all sorts of correctional operations issues, the following procedure will be employed:

- All correspondence should come directly to the undersigned. Duplicate (triplicate) letters to different state authorities (known as the "buckshot" approach) will be responded to, if necessary, from one source. This will eliminate redundancy and a waste of taxpayer money.
- Correspondence will be responded to on a monthly basis, if necessary.
- Issues that are written about repeatedly will be reviewed and, depending on urgency, relevancy, or need, will be responded to accordingly.
- Issues stemming from your daily activities need to be dealt with at the local level with the institutional staff. We encourage you to use formal methods to solicit resolution to institutional issues. Each institution has the authority to carry out the department's policies and procedures.
- All letters discriminatory in nature will be disregarded.
- All letters of accusation will be addressed if required.
- All letters insulting or derogatory in nature will be disregarded.

... These guidelines will help set a venue for constructive communications and more efficient handling of your correspondence.

See Exhibit FFF, Plaintiff's Memorandum in Response to Defendant's Motion for Summary Judgment ("Plaintiff's Response"). Similarly, defendant Vail's September 23, 2003 letter was "done in an effort to avoid inconsistency of response and save staff time and effort in investigating and re-investigating" plaintiff's "various concerns." Exhibit 1 (¶ 6), Defendant's Motion; see also Exhibit BBBB, Plaintiff's Response.

The implementation of such processes to handle large volumes of correspondence from individual prisoners also appeared not to have been limited to plaintiff. For example, it was "a long standing practice within" the DOC "to coordinate responses to offenders who generate a large volume of correspondence," in order "to reduce duplication efforts on the part of many staff." Exhibits P5 (¶ 18 Response), G6 (No. 5 Answer), I6 (No. 32 Answer), Plaintiff's Response. Thus, while the DOC did not have a "set 'practice'" for responding to individuals who were "frequent writers," such cases often "resulted in the centralizing of

REPORT AND RECOMMENDATION
Page - 3

correspondence or a 'contact person'" who kept "track of various correspondence issues." Exhibit 1 (¶ 8), Defendants' Motion. Indeed, there appear to be a number of other inmates for whom the DOC currently is handling correspondence in the same manner it is handling plaintiff's, or for whom the DOC has imposed "a certain level of coordination" for responding "to frequent correspondence concerns." Exhibits P5 (No. 18 Response), Exhibit H6 (¶ 15 Response), Plaintiff's Response.

In accordance with the guidelines outlined in the September 23, 2003 Eldon Vail letter, the DOC's Correspondence Unit received all correspondence plaintiff sent to DOC headquarters or to the Governor's Office, which then was forwarded by the Governor's Office to the DOC Correspondence Unit. Exhibit 1 (¶ 5), Defendants' Motion. Denise Vaughan was assigned to respond to all such correspondence. Id. To that end, Ms. Vaughan contacted "applicable agency staff," gathered the information needed to respond to plaintiff's correspondence, respond to plaintiff, and provide copies of such responses to the Governor's Office when applicable and requested. Id. All inmate correspondence between the Governor's Office and the DOC, including plaintiff's, was handled in this manner. Id.

As noted above, the DOC did "not have a set 'practice' used" to respond to individuals who were "frequent writers." Id. at ¶ 8. Rather, if an individual inmate wrote "with frequency" to various DOC staff, this often then resulted "in the centralizing of correspondence or a 'contact person'" who kept track of various correspondence issues," in order to "avoid duplication of staff time, effort and response." Id. In a letter dated June 11, 2004, written in response to plaintiff's request for "any document that represents the new policy that has been developed solely to be used against me, respective of collecting my outgoing mail," Ms. Vaughan thus stated in relevant part as follows:

> There is no "policy" regarding your mail. As such, no policy document will be provided. I will however reiterate current process regarding the coordination of response to your correspondence.
>
> In an effort to avoid duplication of response and staff effort, the Department has chosen to centralize the handling of your correspondence. Appropriate staff are contacted for information and input in providing response to your correspondence issues. In addition, any correspondence you send in pre-franked envelopes is being sent through the United States Mail before being forwarded to the staff member(s) responsible to address your correspondence.

Id., Attachment A. Plaintiff was informed of this process once again by Ms. Vaughan via letter less than two weeks later. See Exhibit NN, Plaintiff's Response.

In addition for the need to coordinate the correspondence plaintiff sent to DOC headquarters and

REPORT AND RECOMMENDATION
Page - 4

1  the Governor's Office, soon after he arrived at the Washington State Penitentiary it was determined that a
2  procedure for handling "the large number of letters" he was sending to institutional staff there was needed
3  as well. Exhibit 2 (¶ 5), Defendants' Motion. To that end, Megan Murray was designated as "the point of
4  collection" for all of plaintiff's correspondence, except for his "pre-franked" (i.e., "stamped, and ready for
5  first class mailing") envelopes. Id. at ¶ 4 and ¶ 6. With respect to plaintiff's first class mail, it "was to be
6  processed through the mailroom and the U.S. Postal Service, so as to not interfere with the regular mail
7  process." Id. at ¶ 6. As soon as plaintiff's correspondence, first class mail or otherwise, was received by
8  the institution staff, it would be forwarded to Ms. Murray. Id. at ¶ 7 and ¶ 9. It then would be "reviewed
9  every 2 to 3 weeks" by both Ms. Murray and Lori Scanlon, so as "to establish if a response was needed."
10 Id. at ¶ 7, Attachments B and C.

11         Because "a number" of plaintiff's correspondence contained "repeating/duplicative issues" though,
12 "there were times" when it was reviewed only monthly. Id. at ¶ 7. In addition, it was determined that "not
13 every piece of correspondence needed" a response. Id. Although some of plaintiff's first class mail was
14 "mistakenly taken out" of his housing unit's mail box prior to being processed as such in early 2004, once
15 this was discovered, Ms. Murrary "immediately" sent it out as first class mail with "very little, if any, delay
16 in processing." Id. at ¶ 10, Attachment E; see also Exhibit W5 (¶ 39 Response), Plaintiff's Response. At
17 the same time, an e-mail message also was sent to various DOC staff with instructions that his "outgoing
18 pre-franked envelopes were not to be pulled from the outgoing mail, but processed normally." Exhibit 2 (¶
19 9) (emphasis in original) and Attachment D), Defendants' Motion; Exhibit BBB, Plaintiff's Response.

20         Plaintiff's "kites" (i.e., "internal letters that inmates are instructed to use to communicate with DOC
21 staff") that dealt with housing "unit issues were to be addressed within" his own housing unit, as those
22 issues "generally involved issues that could be easily resolved by Unit staff." Exhibit 2 (¶4 and ¶ 11),
23 Defendants' Motion; Exhibits T6 (No. 11 Answer), W6 (No. 1 Answer), Plaintiff's Response. Again,
24 while some of plaintiff's kites apparently "were incorrectly sent" to Ms. Murray "rather than going to the
25 person they were addressed to," this problem was corrected, and DOC staff members were informed that
26 any such kite "needed to be sent to the person" to whom it was addressed. Exhibit 2 (¶ 12 and Attachment
27 F), Defendants' Motion. Plaintiff, furthermore, continued to retain the "ability to apeak with staff and
28 write letters," as well as the "ability to file grievances in the normal manner." Id. at ¶ 13; Exhibits DDD,

REPORT AND RECOMMENDATION
Page - 5

CCCC, N6 (No. 12 Answer), P6 (No. 28 Response), T6 (No. 12 Answer), V6 (No. 28 Response), W6 (No. 10 Answer and No. 12 Answer), Plaintiff's Response.

It appears plaintiff retained the ability to file grievances and to access institutional staff during his incarceration at the Clallam Bay Corrections Center as well. Exhibit 3 (¶ 6 and ¶ 7), Defendant's Motion. In addition, the practices regarding plaintiff's correspondence that were put in place at the Airway Heights Correctional Center ("AHCC"), where he is currently incarcerated, also appear to have been consistent with the process for handling his correspondence outlined in the September 23, 2003 Eldon Vail letter. Exhibit B6 (No. 13 Response), Plaintiff's Response. Indeed, plaintiff was at the AHCC when he received the early August 1999 DOC letter noted above, outlining a substantially similar process for handing his correspondence. Id. at No. 14 Response.

Plaintiff filed his federal civil rights complaint with this court on October 4, 2004, alleging the constitutional violations stemming from defendants' implementation of the processes for handling his correspondence noted above. (Dkt. #4). Defendants originally filed their motion for summary judgment on September 5, 2005, which was noted for consideration on October 7, 2005. (Dkt. #34). However, due to an extension of the discovery deadline in this case, defendants' motion was re-noted for consideration on January 13, 2006. (Dkt. #41). That motion is now ripe for consideration.

## DISCUSSION

Summary judgment shall be rendered if the pleadings, exhibits, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56(c). In deciding whether summary judgment should be granted, the court must view the record in the light most favorable to the nonmoving party and indulge all inferences favorable to that party. Fed. R. Civ. P. 56(c) and (e). When a summary judgment motion is supported as provided in Fed. R. Civ. P. 56, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in Fed. R. Civ. P. 56, must set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e). If the nonmoving party does not so respond, summary judgment, if appropriate, shall be rendered against that party. Id.

The moving party must demonstrate the absence of a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). Mere disagreement or the bald assertion that a genuine

issue of material fact exists does not preclude summary judgment. California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987). A "material" fact is one which is "relevant to an element of a claim or defense and whose existence might affect the outcome of the suit," and the materiality of which is "determined by the substantive law governing the claim." T.W. Electrical Serv., Inc. v. Pacific Electrical Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

Mere "[d]isputes over irrelevant or unnecessary facts," therefore, "will not preclude a grant of summary judgment." Id. Rather, the nonmoving party "must produce at least some 'significant probative evidence tending to support the complaint.'" Id. (quoting Anderson, 477 U.S. at 290); see also California Architectural Building Products, Inc., 818 F.2d at 1468 ("No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment."). In other words, the purpose of summary judgment "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." Lujan v. National Wildlife Federation, 497 U.S. 871, 888 (1990).

Along with his response to defendants' motion for summary judgment, plaintiff also has submitted a "Statement of Disputed Facts," setting forth 288 alleged "Genuine Issues of Material Facts" which he claims "are in dispute." See Plaintiff's Statement of Disputed Facts in Response to Defendants' Motion for Summary Judgment. The vast majority of these alleged genuine issues of material fact, however, are either legal conclusions or facts which are not "material" in the sense discussed above. Plaintiff also has filed a declaration, in which he contests defendants' presentation of the facts in this case. See Declaration of Rick A. Young in Support of Plaintiff's Response to Defendants' Motion for Summary Judgment. That declaration, however, largely consists of conclusory allegations with lists of documentary exhibits without any explanation as to how those exhibits are relevant to his claims. To the extent plaintiff does reference specific documentary evidence in his declaration, furthermore, as discussed below, that evidence actually tends to support defendants' motion for summary judgment. The undersigned therefore finds that plaintiff has not shown the existence of any genuine issue of material fact, and that for the reasons set forth below defendants are entitled to summary judgment.

I.  Plaintiff First Amendment Rights Were Not Violated

There are "four principles to consider" when a challenged action by prison officials "is attacked on constitutional grounds." Brown v. Johnson, 743 F.2d 408, 410 (6th Cir. 1984). First, "convicted prisoners

REPORT AND RECOMMENDATION
Page - 7

do not forfeit all constitutional protections by reason of their conviction and confinement." Id. (quoting Bell v. Wolfish, 441 U.S. 520, 545 (1979)). An inmate thus "retains those rights that are 'not inconsistent with his status as a prisoner or with the legitimate penalogical [sic] objectives of the corrections system." Id. (quoting Pell v. Procunier, 417 U.S. 817, 822 (1974)). Such "[l]egitimate penological" objectives or interests "include 'security, order, and rehabilitation.'" Witherow v. Paff, 52 F.3d 264, 265 (9th Cir. 1995) (quoting Procunier v. Martinez, 416 U.S. 396, 413 (1974)).

Second, just because inmates "retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations." Brown, 743 F.2d at 410 (quoting Bell, 441 U.S. at 546). In other words, "[t]here must be a 'mutual accommodation' between institutional needs and objectives and the provisions of the Constitution that are of general application." Id. Therefore, in evaluating the extent of the burden placed on a prisoner's constitutional rights, the courts must balance those rights against the government's legitimate interests. Turner v. Safley, 482 U.S. 78, 88 (1987).

The third principle is that "'maintaining security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights' of convicted prisoners." Brown, 743 F.2d at 410 (quoting Bell, 441 U.S. at 546). Fourth, and finally:

> [B]ecause the daily operation of a correctional facility poses difficult and unique management problems, prison officials should be accorded substantial deference in the adoption and implementation of policies and practices that in "their judgment are needed to preserve internal order and discipline and to maintain institutional security. 'Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.'"

Id. (quoting Bell, 441 U.S. at 547-48); see also Turner, 482 U.S. at 86.

In the context of mail restrictions, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner, 482 U.S. at 89. To determine "the reasonableness of the regulation at issue," there are several factors that are relevant to consider. Id. Thus, "[f]irst, there must be a 'valid, rational connection'" between the prison's action and "the legitimate governmental interest put forward to justify it.'" Id. (citation omitted). Under this factor, the action "cannot be sustained where the logical connection" between it and "the asserted goal is so remote as to render the policy arbitrary or irrational." Id. at 89-90. The governmental objective or interest also "must be a legitimate and neutral one." Id. at 90. That is, the particular action at issue must

REPORT AND RECOMMENDATION
Page - 8

operate "in a neutral fashion, without regard to the content of the expression." Id.

The second factor "is whether there are alternate means of exercising the right that remain open to prison inmates." Id. Thus, "[w]here 'other avenues' remain available for the exercise of the asserted right, . . . courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity" of the action. Id. (citations omitted). The third factor "is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." Id. In other words, "[w]hen accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." Id.

Lastly, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." Id. On the other hand, "the existence of obvious easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." Id. Prison officials, however, need not "set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint" to satisfy this factor. Id. at 90-91. In other words, it "is not a 'least restrictive alternative' test." Id. Nevertheless, if a prisoner "can point to an alternative that fully accommodates" his or her "rights at *de minimis* cost to valid penological interests, a court may consider that as evidence" that the governmental action "does not satisfy the reasonable relationship standard." Id. at 91.

While the above factors generally have been applied by the Supreme Court to governmental action affecting incoming inmate mail (see Turner, 482 U.S. 78; Thornburgh v. Abbott, 490 U.S. 401 (1989)), the standards for evaluating restrictions on a prisoner's outgoing mail, though stricter, are not substantially different for the purposes of this case. With respect to such restrictions, the Supreme Court has stated:

> First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials . . . must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad.

Abbott, 490 U.S. at 408 (quoting Martinez, 416 U.S. at 413-14. Even under this standard, however, prison officials are not deprived "of the degree of discretion necessary to vindicate 'the particular governmental interest involved.'" Id. at 409 (quoting Martinez, 416 U.S. at 414).

REPORT AND RECOMMENDATION
Page - 9

The Supreme Court thus has further stated that:

> Some latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty. But any regulation or practice that restricts inmate correspondence must be generally necessary to protect one or more . . . legitimate governmental interests.

Id. In other words, even with respect to outgoing inmate mail, the Court has "required no more than that" the challenged governmental action "be 'generally necessary' to a legitimate governmental interest." Id. at 411 (quoting Martinez, 416 U.S. at 414); see also Witherow, 52 F.3d at 265 ("When a prison regulation affects outgoing mail as opposed to incoming mail, there must be a 'closer fit between the regulation and the purpose it serves.'") (quoting Abbott, 490 U.S. at 412).

This somewhat greater required showing on the part of the government is due to the recognition that "outgoing personal correspondence from prisoners" in general does "not, by its very nature, pose a serious threat to prison order and security." Abbott, 409 U.S. at 411, 413 (implications of outgoing correspondence for prison security are of categorically lesser magnitude than implications of incoming materials). At no time, however, with respect to a prison's actions affecting either incoming or outgoing inmate mail, must a "least restrictive means" test be satisfied. Witherow, 52 F.3d at 265 (citing Abbott, 409 U.S. at 411-13).

Under either the "reasonably related" or the "generally necessary" standard, the undersigned finds the actions taken by defendants with respect to plaintiff's correspondence to be constitutionally valid. The evidence in the record indicates the nature and extent of plaintiff's correspondence with DOC officials has been such that at least some level of centralization and coordination of response was necessary to ensure consistency of response, conserve staff time and effort, and avoid the wasting of state prison resources and taxpayer money. It does not take much to realize that when substantial staff time and effort are tied up in responding to numerous and redundant correspondence from only a few of the many thousands of inmates currently under the care of the DOC, prison order and security are compromised. As noted above, prison order and security constitute legitimate governmental interests.

Plaintiff asserts there is no evidence in the record that his correspondence has been such so as to require the kind of centralization and coordination of response implemented by defendants. However, the affidavits and other documentation filed with this court, including many of plaintiff's own exhibits, belie that assertion. For example, between June 22, 2005, and December 2, 2005, alone, plaintiff filed a total of

REPORT AND RECOMMENDATION
Page - 10

788 public disclosure requests, which caused DOC officials to have to gather in response thereto 12,151 pages of documentation. Exhibit 1 (¶ 3), Defendants' Reply in Support of Motion for Summary Judgment ("Defendant's Reply"). While more than 1600 hours of staff time was spent responding to these requests, plaintiff paid for and received only 70 of the requested pages of documentation. Id.

Although plaintiff has not raised any specific claims regarding his public disclosure requests in his complaint, and thus are not at issue here, they are evidence of the manner in which he has corresponded with DOC officials, and the time and effort required by such officials to deal with that correspondence. Plaintiff thus appears to be using his public disclosure requests for other than legitimate purposes, i.e., to harass DOC officials and cause much more work for them than is necessary. Again, for example, in one of his public disclosure requests, plaintiff stated:

> As always, should I be transferred to TRCC [Twin Rivers Corrections Center] prior to your completion of this request (I recently had a classification hearing, but doubt any such transfer will occur), this request and all other PD requests and legal venues in effect by me, will cease to be effected; and I will contact you to verify that fact upon such TRCC placement.

Exhibit 1, Attachment A (p. 2), Defendants' Reply. In another letter plaintiff sent concerning his public disclosure requests, he wrote:

> THE CATCH FOR [DOC OFFICIAL] RISA KLEMME: I have advised her that from here on out, it will take approximately a TEN FOLD increase in the NUMBER of INDIVIDUAL PUBLIC DISCLOSURE REQUESTS, in order to fulfill my document searches.
> THAT EFFECTIVELY MEANS MORE WORK FOR RISA KLEMME, SINCE IT WILL BE THE SAME AMOUNT OF REQUESTS, ONLY INDIVIDUALLY INSTALLED TO FIT THE NEW PROCEDURE IMPOSED. The negative side of it, that Risa Klemme will have to work with more actual individual requests, individual mailings, etc.
>
> I made eleven (11) individual installment requests last week, and will make ten (10) each week from here on out. I was making merely several a month, previously. I will also re-request any installment discontinued by this new procedure, once RISA KLEMME officially discontinues it – whenever the new AD HOC rule times it . . .
>
> We are presently educating the AHCC population to the new RISA KLEMME TRICK, advising them how to circumvent an attempt to deny inmates document access under the RCW. RISA KLEMME will soon find all her Public Disclosure requests presented as single-installment, single requests; in multiple separate request documents.
>
> I told AHCC to transfer me: ENJOY THE DOCUMENT SEARCHES. I am close to where I can AGAIN begin to file additional 42 U.S.C. § 1983 Complaints; yipie kie-aaaaaa!!!

Exhibit 1, Attachment B (p. 3) (emphasis in original), Defendants' Reply.

REPORT AND RECOMMENDATION
Page - 11

As discussed above, furthermore, the September 23, 2003 Eldon Vail letter was not the first time plaintiff was warned that the nature and extent of his correspondence with DOC officials required that a more centralized and coordinated response be implemented. Indeed, as far back as early August 1999, plaintiff was told that similar measures would be taken regarding his correspondence because of the effect that correspondence was having on DOC resources, and the desire to provide a more effective response to his concerns. It also appears plaintiff had been sending "numerous pieces of correspondence" to DOC and other state officials for "over 20 years" prior thereto. Exhibit FFF, Plaintiff's Response.

The affidavits submitted by defendants also indicate the amount of plaintiff's correspondence with DOC and other state officials were numerous and often redundant, which required "a tremendous amount of staff time and effort" expended in responding thereto. See Exhibits 1 (¶ 4 and ¶ 6) and 2 (¶ 5 and ¶ 7), Defendants' Motion; Exhibit 1 (¶ 3), Defendants' Reply. The discovery materials plaintiff submitted with his response themselves show his correspondence was numerous and duplicative as well. See Exhibits R5 (pp. 6-7, No. 4 Response), W5 (p. 6, No. 7 Response), A6 (No. 1 Answer), B6 (No. 12, No. 14 and No. 17 Responses), D6 (No. 4, No. 9, No. 10, and No. 11 Answers), G6 (No. 1, No. 3 and No. 5 Answers), I6 (No. 32 Response), J6 (No. 3 Answer), U6 (No. 18 and No. 19 Responses), Plaintiff's Response. In addition, on at least two occasions in 2002 and 2003, plaintiff was infracted for mail violations for using inappropriate language in written communication between him and a DOC staff member. Exhibits P5 (No. 36 Response) and R5 (No. 41 Response), Plaintiff's Response.

The undersigned further finds the governmental interest at stake here also to have been operated "in a neutral fashion, without regard to the content" of plaintiff's expression. Turner, 482 U.S. at 90. The record indicates that the mail handling processes were implemented by defendants not in response to any particular form of expression contained in plaintiff's correspondence, but rather because of the extent and volume of that correspondence. Indeed, as noted by defendants in their reply and as discussed in greater detail below, the processes established by defendants to handle plaintiff's correspondence do not appear to have impaired his outgoing mail, or otherwise restricted his ability to make his grievances known.

Plaintiff has not demonstrated he was prohibited or restricted from sending out correspondence to DOC staff or other state officials, except in those few instances noted above that were quickly corrected, where his pre-franked envelopes were mistakenly taken out prior to mailing. Other avenues, furthermore,

REPORT AND RECOMMENDATION
Page - 12

continued to exist through which plaintiff could make his concerns and complaints heard. For example, the record shows his ability to submit kites, file grievances and directly access institutional staff was not in any way impaired. See Exhibit 2 (¶4, ¶ 11, ¶ 12, ¶ 13, and Attachment F), Exhibit 3 (¶ 6 and ¶ 7), Defendants' Motion; Exhibits DDD, CCCC, N6 (No. 12 Answer), P6 (No. 28 Answer), T6 (No. 11 and No. 12 Answers), V6 (No. 28 Response), W6 (No. 1, No. 10 and No. 12 Answers), Plaintiff's Response. Thus, the second Turner factor appears to be satisfied here as well.

With respect to the third Turner factor, as discussed above, the evidence in the record shows that plaintiff's longstanding propensity to send voluminous and repetitive written communication to DOC and other state officials has had a serious and substantial impact on the allocation of prison resources. Thus, enjoining defendants from being able to centralize and coordinate DOC staff responses as plaintiff would have the court do, would almost certainly have a significant "ripple effect" on prison staff. As such, the undersigned finds the court should do as instructed by the Supreme Court and "be particularly deferential to the informed discretion of corrections officials." Turner, 482 U.S. at 90.

Finally, there appears to be an "absence of ready alternatives" to the processes for centralizing and coordinating plaintiff's written correspondence outlined in the September 23, 2003 Eldon Vail letter. Id. Specifically, plaintiff has pointed to no "obvious easy alternatives" that would more fully accommodate his constitutional rights "at *de minimis* cost to valid penological interests" than the processes implemented by defendants. Id. Indeed, as discussed above, although defendants centralized and coordinated how they had DOC staff respond to plaintiff's correspondence, there is no indication in the record that his ability to send out mail or make his grievances known were in any way impaired. As such, the undersigned finds the mail handling processes implemented by defendants both satisfies all of the Turner factors, and were no greater than "necessary or essential to the protection of the particular governmental interest involved." Abbott, 490 U.S. at 408.

II.     Plaintiff Has Failed to State a Lack of Access to Court Claim

Defendants argue in their motion that while plaintiff does not explicitly allege an access to courts claim in his complaint, a liberal reading of that complaint could find an implied claim. To the extent that plaintiff has alleged an access to courts claim, defendants argue that he has failed to properly do so. The undersigned agrees. Inmates have "a constitutional right of access to the courts." Cornett v. Donovan, 51

F.3d 894, 897 (9th Cir. 1995). That right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers" by providing them with "adequate law libraries or adequate assistance from persons trained in the law." Lewis v. Casey, 518 U.S. 343, 346 (1996) (quoting Bounds v. Smith, 430 U.S. 817, 828 (1977)).

Because "meaningful access to the courts is the touchstone" here, to prevail on an access to courts claim, plaintiff must "demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." Cornett, 51 F.3d at 897 (citing Bounds, 430 U.S. at 823); see also Lewis, 518 U.S. at 348 (inmate must show inadequacy of prison library or legal assistance program caused actual injury or prejudice such as inability to meet filing deadline or present claim). For example, plaintiff might show:

> [T]hat a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint.

Lewis, 518 U.S. at 352. Here, plaintiff has not alleged that the inadequacy of his institution's law library or other legal resources, or defendants' processes for handling his correspondence, prevented him from meeting a filing deadline or from bringing a claim before the courts. Plaintiff does allege that he has been prevented from being able to exhaust his administrative remedies because of those processes. However, the evidence in the record shows that he has been able to do so. See Exhibit DDD, Plaintiff's Response. As such, he has failed to establish a valid access to courts claim.

III.   Defendants' Actions Did Not Violate Plaintiff's Equal Protection Rights

The Equal Protection Clause requires that all persons similarly situated be treated similarly by the government. Inmates are protected under the Equal Protection Clause against invidious discrimination. Wolff v. McDonnell, 418 U.S. 539, 556 (1974); Lee v. Washington, 390 U.S. 333, 334 (1968). To set forth a *prima facie* violation of the Equal Protection Clause a plaintiff first must prove a discriminatory intent or purpose. Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 265 (1977); Bagley v. CMC Real Estate Corp., 923 F.2d 758, 763 (9th Cir. 1991). Conclusory allegations by themselves do not establish an equal protection violation without further proof of invidious discriminatory intent. See Village of Arlington Heights, 429 U.S. at 265.

REPORT AND RECOMMENDATION
Page - 14

Plaintiff must "show that he was treated differently from other inmates because he belonged to a protected class." Seltzer-Bey v. Delo, 66 F.3d 961, 964 (8th Cir. 1995); see also Barren v. Harrington, 152 F.3d 1193, 1195 (9th Cir. 1998) (to state claim under section 1983, plaintiff must show intent or purpose to discriminate against him based upon membership in protected class). The fact that plaintiff is a prisoner, however, does not itself qualify him as a member of a protected class for Equal Protection Clause purposes. See Wolff, 418 U.S. at 556 (prisoners protected from invidious discrimination based on race); Freeman v. Arpaio, 125 F.3d 732, 737 (9th Cir. 1997) (inmates protected from intentional discrimination based on religion).

Prisoners also "do not constitute a suspect class." Pryor v. Brennan, 914 F.2d 921, 923 (7th Cir. 1990); Moss v. Clark, 886 F.2d 686, 690 (4th Cir. 1989); Thornton v. Hunt, 852 F.2d 526, 527 (11th Cir. 1988). That is, "[t]he status of incarceration is neither an immutable characteristic, nor an invidious basis of classification." Moss, 886 F.2d at 690 (internal citations omitted). Further, when a suspect class is not implicated, the court must determine whether the alleged discrimination is "patently arbitrary and bears no rational relationship to a legitimate governmental interest." Vermouth v. Corrothers, 827 F.2d 599, 602 (9th Cir. 1987) (citation omitted).

Here, plaintiff has not alleged defendant discriminated against him based on his race or religion. Village of Arlington Heights, 429 U.S. at 265; Vermouth, 827 F.2d at 602. As discussed above, he also has not shown that the centralization and coordination of DOC staff responses to his correspondence by defendants bears no rational relationship to a legitimate governmental interest. Id. Accordingly, plaintiff has failed to establish that his right to equal protection under the law was violated.

IV.   Plaintiff Due Process Rights Were Not Violated

The Due Process Clause of the Fourteenth Amendment provides that no state shall deprive "any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. Substantive due process protects individuals from arbitrary and unreasonable government action which deprives any person of life, liberty, or property. Kawaoka v. City of Arroyo Grande, 17 F.3d 1227, 1234 (9th Cir. 1994). To establish a substantive due process violation, the government's action must have been "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." Sinaloa Lake Owners, 882 F.2d 1398, 1407 (9th Cir. 1989) (quoting Village of Euclid v. Ambler

REPORT AND RECOMMENDATION
Page - 15

Realty Co., 272 U.S. 365, 395 (1926)); Bateson v. Geisse, 857 F.2d 1300, 1303 (9th Cir.1988).

Plaintiff alleges that the processes for handling his mail implemented by defendants violated his due process rights. As discussed above, however, plaintiff has failed to show defendants' actions in handling his correspondence were clearly arbitrary and unreasonable, having no substantial relation to prison security and order, a legitimate governmental interest.

In the prison context, furthermore, an inmate will be found to have "a liberty interest under the federal constitution when a change occurs in confinement that imposes an 'atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'" Resnick v. Hayes, 213 F.3d 443, 448 (9th Cir. 2000) (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995); Jackson v. Carey, 353 F.3d 750, 755 (9th Cir. 2003). Plaintiff, however, again has not shown that defendants' correspondence handling processes imposed an "atypical and significant hardship" on him "in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 484.

First, as discussed above, plaintiff has not even shown that his ability to send correspondence, file kites or submit grievances were in any meaningful way impaired. In addition, also as discussed above, he has failed to demonstrate the centralizing and coordination of DOC staff responses to his correspondence was even atypical. Indeed, it appears that there has been "a long-standing practice within" the DOC "to coordinate responses to offenders who generate a large volume of correspondence," in order "to reduce duplication efforts on the part of many staff." See Exhibits P5 (¶ 18 Response), G6 (No. 5 Answer), I6 (No. 32 Answer), Plaintiff's Response; Exhibit 1, ¶ 8, Defendants' Motion. It further seems that plaintiff is not the only inmate in the Washington state correctional system with respect to whose correspondence the DOC has imposed "a certain level of" coordinated response. See Exhibits P5 (No. 18 Response) and H6 (No. 15 Response), Plaintiff's Response.

V. <u>Defendant Lehman Should Be Dismissed for Lack of Personal Participation</u>

To state a claim under 42 U.S.C. § 1983, a complaint must allege: (i) the conduct complained of was committed by a person acting under color of state law and (ii) the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the United States. Parratt v. Taylor, 451 U.S. 527, 535 (1981), overruled on other grounds, Daniels v. Williams, 474 U.S. 327 (1986). Section 1983 is the appropriate avenue to remedy an alleged wrong only if both of these elements are present.

REPORT AND RECOMMENDATION
Page - 16

Haygood v. Younger, 769 F.2d 1350, 1354 (9th Cir. 1985).

Plaintiff also must allege facts showing how individually named defendants caused or personally participated in causing the harm alleged in the complaint. Arnold v. IBM, 637 F.2d 1350, 1355 (9th Cir. 1981). A defendant cannot be held liable under 42 U.S.C. § 1983 solely on the basis of supervisory responsibility or position. Monell v. New York City Dept. of Social Services, 436 U.S. 658, 694 n.58 (1978). A theory of *respondeat superior* is not sufficient to state a section 1983 claim. Padway v. Palches, 665 F.2d 965, 968 (9th Cir. 1982).

Defendants argue plaintiff has failed to allege personal participation for defendant Joseph Lehman. The undersigned agrees. *The only mention of defendant Lehman anywhere in the body of the complaint is in reference to two letters plaintiff allegedly sent him and other named defendants in early July and late September 2004, titled "Notification of Constitutional Violations Under 28 U.S.C. § 1983 – To Avoid Qualified Immunity" and "FINAL REQUEST FOR WRITTEN POLICY/"GUIDELINES" RESPECTIVE OF THE SEPT. 2003 AD HOC POLICY APPLICATION" respectively. See Complaint, attachment to page 3, pages 8 and 10. As such, it appears defendant Lehman has been named only in his supervisory capacity, which is insufficient to establish section 1983 liability. Indeed, plaintiff states in his response that* defendant Lehman should not be dismissed, because he "is the Chief authority over all of Washington State corrections, can overrule any underlying correctional decision, or abolish any DOC policy or action." Plaintiff's Response, pp. 17-18. The discovery materials submitted by plaintiff also fail to show personal participation by defendant Lehman. Exhibits Q5, D6, E6, and F6, Plaintiff's Response.

VI.    Qualified Immunity

Defendants argue they are entitled to qualified immunity in this case. However, in light of the findings set forth above, the undersigned declines to rule on that issue.

## CONCLUSION

Defendants have met their burden of demonstrating that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. Plaintiff has failed in all instances to allege facts sufficient to form a constitutional violation. Accordingly, the undersigned recommends that the court GRANT defendants' motion for summary judgment.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedures, the

parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. See also Fed.R.Civ.P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **February 17**, as noted in the caption.

DATED this 1st day of February, 2006.

*[signature]*

Karen L. Strombom
United States Magistrate Judge